UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RICHARD JAGGARD and JUDY JAGGARD,<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT CARDIOVASCULAR SYSTEMS INC., a California corporation, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 3:21-CV-00360-RCJ-CLB<br><br>ORDER |

Defendant, Abbott Cardiovascular Systems Inc. ("Abbott"), brings a Motion for Summary Judgment against Plaintiffs Richard and Judy Jaggard (collectively "Plaintiffs"). (Dkt. 47). Abbott also requests permission to file the summary judgment motion under seal. (Dkt. 46). Abbott argues that summary judgment is appropriate for four reasons: (1) Plaintiffs' suit is time barred by the statute of limitations, (2) Plaintiffs released their claims against Abbott in a previous settlement agreement, (3) the record lacks expert evidence as to causation, and (4) the record lacks evidence of any product defect recognized under Nevada law. (Dkt. 47 at 3–4). For the reasons discussed below, the Court finds that Plaintiffs have previously released their claims against Abbott, and Abbott is entitled to summary judgment in its favor.

I.   FACTUAL BACKGROUND

A. Injury

In March of 2017, Jaggard was admitted to St. Mary's Regional Medical Center ("St. Mary's") and underwent a cardiac catheterization and angioplasty to remove blockage in his

coronary arteries. (Dkt. 47 at 3); (Dkt. 26 at 2). Dr. Devang Desai, M.D. ("Dr. Desai") treated the blockages by inserting catheters and a Hi-Torque Balance Middleweight Guide Wire ("BMW Wire"), manufactured by Abbott, into Jaggard's blood vessels using his right wrist as the entry point. (Dkt. 47 at 5–6); (*see also* Dkt. 47-7 at 2–3). The catheters cleared a pathway for the BMW Wire to move up the artery, through the blood vessels and to the blockage "like a rail to guide a stent to support the artery's wall." (*Id.*).

Originally cleared for use in 1997, (Dkt. 47 at 4), the BMW Wire is a medical device approved under the FDA's 510(k) process. *See* 21 U.S.C. § 301-399i; 21 C.F.R. 807 (requirements for 510(k) submission). The BMW Wire is "intended to facilitate the placement of balloon dilatation catheters during percutaneous transluminal coronary angioplasty (PTCA) and percutaneous transluminal angioplasty (PTA)."[1] The BMW Wire is "one of the most frequently used wires in interventional cardiology[.]" (Dkt. 47-15 at 6); (*see also* Dkt. 47-12 at 3).

In his operative notes, Dr. Desai recorded that there was "resistance" when removing the BMW Wire. (Dkt. 47-7 at 3). Dr. Desai also recorded that the tip of the BMW Wire marker had stripped off the BMW Wire but that the rest of the wire "appeared intact." (*Id.*). Jaggard was then discharged from the hospital. (Dkt. 47 at 6). Roughly two weeks later, Jaggard experienced symptoms that prompted him to return to the hospital. (*Id.*). He continued to suffer from the same symptoms that he suffered from leading up to the procedure to clear the blockages in his arteries. (*Id.*). To treat his symptoms, Dr. Frank Carrea, M.D. "(Dr. Carrea") performed another cardiac catheterization. (*Id.*). In doing so, Dr. Carrea discovered that, despite Dr. Desai's observation that the BMW Wire appeared intact, a strand of the BMW Wire remained inside of Jaggard from the previous procedure. (*Id.*); (Dkt. 47-8 at 3); (Dkt. 47-9 at 2). During the procedure, Jaggard's wife

---

[1] This definition comes from the 510(k) clearance that Abbott submitted to Department of Health and Human Services on October 21, 2015. (Dkt. 47-6 at 19).

remained in the waiting room where a member of his medical team informed her that "they had found a wire in his heart and that the doctor would have to fill [her] in on the details." (Dkt. 47-8 at 3). As a result of this finding, Jaggard would need another procedure to remove the "remaining portion of the wire[.]" (Dkt. 47 at 3).

The following day, the head of the stent lab visited Jaggard in the hospital and "explained what happened." (Dkt. 47-10 at 4). In the first procedure, Dr. Desai had "left behind a portion of an Abbott guide wire that had become snagged in his vasculature." (Dkt. 47 at 3). And although Dr. Carrea was able to remove a piece of the BMW Wire, he did not remove the entire BMW Wire. (Dkt. 47-3 at 16–17); (Dkt. 47-12 at 11). This ultimately led Jaggard to seek a second opinion from Dr. Jason Rogers, M.D. ("Mr. Rogers"), who was willing to try to remove the BMW Wire and treat the blockages that Dr. Desai did not treat. (Dkt. 47-20 at 2). Dr. Rogers quickly performed a procedure removing the BMW Wire that remained in Jaggard. (*Id.*).

**B.  Previous Litigation**

On March 27, 2018, the Jaggards brought an action against St. Mary's and Dr. Desai alleging that their negligence relating to the BMW Wire had caused him to suffer fear and anxiety, concern over past and future medical care, and loss of quality of life. (Dkt. 47 at 7); (Dkt. 47-16 at 7). The case resolved towards the end of 2020 when Plaintiffs settled their claims against St. Mary's and Dr. Desai, (Dkt. 47 at 3). As part of the settlement, Plaintiffs entered into a general release and settlement agreement on February 8, 2021. (Dkt. 47-17 at 7–11).

According to the agreement, the Released Parties were to include "all entities related to in or any way affiliated with Prime Healthcare and St. Mary's Regional Medical Center, which encompass, but are not limited to, subsidiaries, affiliates and related companies, . . . health care providers, nurses, staff, suppliers, representatives, . . . and any other persons, corporations, firms or entities on their behalf liable or allegedly liable, whether known or unknown[.]" (*Id.* at 7–8).

Per the "General Release" clause, Plaintiffs "forever and fully release[d], discharge[d] and aquit[ted] the Released Parties from any and all claims, demands, actions, and causes of action which [Plaintiffs] currently ha[d], or may hereafter have against Released Parties, whether known or unknown, that are in any way related to or allegedly arise out of the events giving rise to the underlying litigation." (*Id.* at 8–9).

Binding upon and inuring to the benefit of all Released Parties, including suppliers, (*id.* at 9), the stated "intent" of the agreement was "to fully and finally settle and compromise any and all claims or causes of action, whether known or unknown, that [Plaintiffs] has or might have against Released Parties . . . that are in any way related to or arise out of the events giving rise to the underlying litigation." (*Id.* at 8). Finally, the agreement stipulates that it is to be governed by Nevada law. (*Id.* at 10).

## II.     LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

In determining summary judgment, a court uses a burden-shifting scheme. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). On the contrary, if the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. However, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Notably, facts are only viewed in the light most favorable to the non-moving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### III.   ANALYSIS

Abbott advances four arguments in favor of summary judgment. (Dkt. 47 at 10–22). First,

it argues that Plaintiffs' claims are barred by the Nevada statute of limitations on personal injury actions. (*Id.* at 10–13). Second, it asserts that Plaintiffs settlement agreement extends to this litigation, releasing Abbott, a supplier of medical equipment to St. Mary's, from the present claims. (*Id.* at 13–14). Third, Abbott argues that Plaintiffs have failed to provide any summary judgment expert evidence as to the element of causation. (*Id.* at 14–15). And, finally, Abbott asserts that Plaintiffs can neither establish any of the three categories of product defects recognized under Nevada law—manufacturing defect, design defect, and failure to warn—or obtain an inference of a product defect. (*Id.* at 15–22).

While Plaintiffs respond to each of Abbott's four arguments, the Court need only address the second one—the effect of Plaintiffs' general release on this action. While the Jaggards do not contest the validity of the release, they argue that the general release in the previous settlement agreement does not extend to Abbott because it was neither "a party to that action" nor a party to the release. (Dkt. 51 at 7). Moreover, Plaintiffs assert that Abbott is not entitled to benefit from the release because it "gave no consideration" in exchange for the benefit. (*Id.*). Finally, arguing that "suppliers" should not be read with its "literal meaning," Plaintiffs claim that the evidence does not indicate that it was their intent that Abbott be included among the Released Parties. (*Id.*).

### A. Settlement Agreements & General Releases

"A settlement is the parties' business. They may compromise just as they may reach any other (lawful) contract." *United States v. Jerome*, 933 F. Supp. 989, 992 (D. Nev. 1996), *rev'd on other grounds*, 124 F.3d 214 (9th Cir. 1997) (quoting *Matter of Mem'l Hosp. of Iowa Cnty., Inc.*, 862 F.2d 1299 (7th Cir. 1988)). In the Ninth Circuit, "[a] settlement agreement is treated as any other contract for purposes of interpretation." *United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992); *see also O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004). Governed by the principles "which apply to interpretations of contracts generally," the Court will

look to Nevada law in resolving this dispute, which governs the settlement agreement in this case. *Parsons v. Ryan*, 912 F.3d 486, 497 (9th Cir. 2018).

Nevada law "recognizes and effectuates release clauses." *Campos v. Town of Pahrump*, 274 F. Supp. 3d 1106, 1112 (D. Nev. 2017). In order to interpret a release clause, "any analysis of a settlement's terms starts with the language of the agreement." *Jones v. McDaniel*, 717 F.3d 1062, 1067 (9th Cir. 2013) (applying Nevada law). Courts "look to the plain meaning of the words as viewed in the context of the contract as a whole" when determining the parties' intent. *Parsons*, 912 F.3d at 497. "[W]hen a release is unambiguous, [courts] must construe it from the language contained within it" with the "ultimate goal [] to effectuate the contracting parties' intent[.]" *Campos*, 274 F. Supp. 3d at 1112. Absent any ambiguity, courts afford contractual language "its plain and ordinary meaning and apply it as written." *Id.*

"A settlement agreement can release claims against non-parties." *Moralez v. Whole Foods Mkt., Inc.*, 897 F. Supp. 2d 987, 995 (N.D. Cal. 2012) (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (holding that "class settlement[s] may also release factually related claims against parties not named as defendants")). When parties enter into a general release, the scope of that release can extend to tortfeasors who are not explicitly named in or identifiable from "the face of a release[.]" *Russ v. Gen. Motors Corp.*, 111 Nev. 1431, 1437 (1995); *see also State Farm Fire & Cas. Co. v. Otto*, 106 F.3d 279, 282 (9th Cir. 1997). When the scope of a settlement is "readily apparent from the releases," a court's inquiry into scope "need go no further than the four corners of the instruments themselves." *Yellowstone Pipe Line Co. v. Kuczynski*, 283 F.2d 415, 420 (9th Cir. 1960).

### B. Effect of Plaintiffs' General Release

In this case, the language of the agreement is unambiguous as to which claims are released and against whom. Plaintiffs agreed to release from "any and all claims," whether known or

unknown, the Released Parties as defined within the agreement. (Dkt. 47-17 at 8). This language leaves, first, no doubt that future claims are released. *See Yellowstone Pipe Line Co. v. Kuczynski*, 283 F.2d 415, 421 (9th Cir. 1960). Second, as to the scope of released tortfeasors, included in the definition of Released Parties are "all entities related to or in any way affiliated with" St. Mary's, including the hospital's "suppliers[.]" (*Id.* at 7). Although "supplier" is left undefined in the agreement, the term is not ambiguous and is commonly understood to mean "a person or company that supplies goods." *Supplier*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/supplier.

Abbott, a manufacturer of medical devices, supplies St. Mary's with BMW Wires, (Dkt. 47 at 13); (Dkt. 10 at 7–8), and, in fact, supplied the BMW Wire used for Jaggard's procedure. (Dkt. 10 at 3). Thus, Abbott is plainly a supplier to the hospital. Indeed, in the hospital's medical records, Abbott is listed multiple times in the "supplies summary." (Dkt. 47-7 at 8–9). Moreover, the BMW Wire's instructions for use, provided to purchasers by Abbott, describes "how [the product is] supplied" when provided to medical facilities. (Dkt. 47-2 at 6). Abbott is certainly affiliated with St. Mary's as a supplier, in the form of medical devices, and the agreement unambiguously includes "suppliers" among the Released Parties. Thus, the scope of Released Parties extends to Abbott.

While the Ninth Circuit has find more limited scopes in the context of previous general releases in some circumstances, this case is distinct from those cases. The scope of a release may not extend to non-parties to the agreement when "the language of the release [does not] refer to an affiliate of" the non-party or when the non-party does not "qualify" as a member of a category listed among the released parties. *Nat'l Enterprises, Inc. v. Joseph-Burnham P'ship*, 25 F. App'x 580, 582 (9th Cir. 2001) ("FIB is not a party to the settlement agreement, nor does the language of the release refer to an affiliate of FIB. Furthermore, FIB does not qualify as a representative,

shareholder, officer, director, agent or assign of National."). But, in this case, the language of the lease facially extends to St. Mary's suppliers, and Abbott certainly qualifies as one such supplier.

The unambiguous language of the settlement agreement squares with the agreement's stated intent—"to fully and finally settle and compromise any and all claims or causes of action, whether known or unknown, that [Plaintiffs] has or might have against Released Parties . . . that are in any way related to or arise out of the events giving rise to the underlying litigation." (Dkt. 47-17 at 8). With the purpose of "avoid[ing] the uncertainties and expense of continuing the litigation and to resolve the disputed claims," Plaintiffs agreed to a "General Release" whose scope unquestionably extends to Abbott. (*Id.*). To read the unambiguous agreement any other way would undermine the agreement's stated purpose, and the Court is "not free to modify or vary the terms of" such an agreement. *Kaldi v. Farmers Ins. Exch.*, 117 Nev. 273, 281, 21 P.3d 16, 21 (2001).

## IV. CONCLUSION

IT IS HEREBY ORDERED that Abbott's Motion for Summary Judgment is **GRANTED**. (Dkt. 47).

IT IS FURTHER ORDERED that Abbott's Motion to Seal is **GRANTED**. (Dkt. 46).

IT IS FURTHER ORDER that the Clerk of the Court shall close the case.

IT IS SO ORDERED.

Dated this 11th day of September 2023.

_____
ROBERT C. JONES
United States District Judge